CAVANAGH, J.
(dissenting). I respectfully dissent from the majority’s misguided interpretation of MCL 777.33. *411 The internal inconsistency in the majority’s reasoning is best illustrated by comparing its statement that when a person dies, the person has suffered an injury, see ante at 402, with its conclusion that when a person dies, the defendant who caused the death is subject to points for causing a “[l]ife threatening or permanent incapacitating injury...MCL 777.33(l)(c). While I agree that when a person dies, the person has presumably suffered an injury, I do not agree that when a person dies, the person has suffered a life-threatening or permanently incapacitating injury. Rather, I believe that the person has suffered an injury that ended the person’s life, i.e., a life-ending injury, and that as such, twenty-five points cannot be scored. Surprisingly, the majority’s error is far removed from its assertion that its interpretation is true to the statutory language.
I do not disagree that for offense variable (OV) 3, the trial court must determine which characteristics of the defendant’s crime apply and assess the highest number of applicable points. I disagree, though, that § 33(1) (c) applies to a situation in which a victim dies. In a departure from the plain language of the statute, the majority’s reading requires substituting “life-ending” for “life-threatening.”
In fact, the prosecutor’s citations of dictionary definitions support my view. The prosecutor states that one dictionary defines “life threatening” as “potentially fatal.” Another defines it as “very dangerous or serious with the possibility of death as an outcome.” The prosecutor advocates that an injury that is “potentially fatal” is equivalent to an injury that is fatal. But an ordinary reading of the statute’s phrase “[l]ife threatening .. . injury” indicates a situation in which a person receives an injury that threatens, but does not take, the person’s life. Contrary to the majority, I would decline *412 to accept the prosecutor’s invitation to read “life-threatening injury” as “life-ending injury.”
Had the Legislature intended that a potentially fatal injury include an injury actually causing death, it would have said so. On the basis of the myriad examples in our statutes in which the Legislature specifies that death is included, such as in the phrase “injury or death,”[1] I would find precluded an argument that where the Legislature says “[l]ife threatening or permanent incapacitating injury” it also means “life-ending injury.” So it is not that defendant assumes that only the “ultimate result” of his criminal act can be considered in scoring OV 3, an argument the majority attributes to him. See ante at 405. Rather, defendant correctly argues that the injury he inflicted was not the type for which points can be assessed under § 33(l)(c). Although a victim of a homicide presumably suffers an injury, the type of injury the victim suffers is a life-ending one, not a life-threatening or permanently incapacitating one.
Moreover, I find unpersuasive the argument that had the Legislature intended to exclude a situation in which a victim dies from the “[l]ife threatening or permanent incapacitating injury” condition specified by MCL 777.33(l)(c), it would have said so. I find more persuasive the view that the Legislature likely did not foresee an attempt to equate a potentially fatal injury with a fatal one. Thus, it most likely found no need to do *413 anything other than preclude the scoring of one hundred points for death when death is an element of the sentencing offense.[2] Quite simply, an injury that causes a death is not a life-threatening or permanently incapacitating injury. The latter, by its plain definition, presumes that the person has survived the physical attack.
The majority’s reasoning results in an interesting conundrum and illuminates that its position is not true to the plain language of the statute or the Legislature’s intent. Suppose a victim dies instantly.[3] Can it truly be said that the victim suffered a permanently incapacitating or life-threatening injury? At what point between the death-causing act and the death was the injury suffered?
If a permanently incapacitating or life-threatening injury cannot be ascertained in the above example, which I do not believe that it can, the majority would then consider if perhaps § 33(l)(d). (“[b]odily injury requiring medical treatment occurred to a victim”) or § 33(l)(e) (“[b]odily injury not requiring medical treatment occurred to a victim”) would apply. The majority asserts that “a gunshot wound to the head is, quite obviously, a bodily injury that does require medical treatment.” Ante at 406 n 13. As such, it concludes that scoring five points under § 33(l)(e) (“[b]odily injury not requiring medical treatment occurred to a victim”) must be excluded. But in an instantaneous death, no medical treatment is required. Would the majority then believe that five points were possible for an injury *414 requiring no medical treatment? Under this contorted analysis, a defendant’s OV 3 score becomes a function of how quickly and painlessly the defendant inflicted death on the victim. The more “efficient” the defendant is, the lower number of points the defendant will receive.
Certainly such an anomaly was not what the Legislature intended. I find incredible that the Legislature intended the courts to delve into these physiological, and even philosophical, questions to reach a proper OV 3 score. Rather, I find quite clear on the face of the statute that the Legislature intended a certain number of points to apply when a victim dies, and fewer points to apply when a victim suffers various degrees of injury. Otherwise, there would be no reason to differentiate so drastically between the number of assessable points for death, one hundred, and the number of points for life-threatening or permanently incapacitating injury, twenty-five.[4]
Thus, it is clear to me that the plain language employed by the Legislature in the statute concerning OV 3 compels a conclusion that points for a “[l]ife *415 threatening or permanent incapacitating injury” are to be assessed only when the injury fits that definition. If homicide is an element of the sentencing offense, a defendant should not be assessed any points for OV 3, even if the victim could be considered to have suffered an “injury” before dying. “Injury” is not synonymous with “life-threatening or permanent incapacitating injury.” Thus, I conclude that the trial court erroneously assessed twenty-five points where defendant’s victim died and homicide was an element of the sentencing offense. I would reverse the trial court in that respect.
THE AVAILABILITY OF A LIFE SENTENCE
If the twenty-five points that were erroneously assessed under OV 3 were subtracted from defendant’s score, defendant would fall within the II-B cell of the sentencing grid contained in MCL 777.61, which specifies a minimum sentence range of 162 to 270 months. After increasing the higher number by twenty-five percent in accordance with the second-offense habitual-offender statute, defendant’s range becomes 162 to 337 months. Although the Legislature has provided sentencing grids that delineate the appropriate sentencing ranges for various combinations of OV and prior record variable (PRV) scores in MCL 777.61 through 777.69, it has not provided separate grids for sentences that are increased when a defendant is an habitual offender.
In this case, the Court of Appeals determined that because defendant’s upper minimum increased to 337 months by virtue of the habitual-offender statute, a life sentence was available. The Court of Appeals reasoned that other cells having an upper minimum of more than three hundred months offer the option of a life sentence, so the Legislature must have intended that any *416 time an upper minimum is more than three hundred months, a life sentence is available.
Because the Legislature chose not to provide sentencing grids governing habitual-offender sentences, the plain language of the habitual-offender sentencing guidelines statute governs. The relevant statute, MCL 777.21, states:
(3) If the offender is being sentenced under section 10, 11, or 12 of chapter IX, determine the offense category, offense class, offense variable level, and prior record variable level based on the underlying offense. To determine the recommended minimum sentence range, increase the upper limit of the recommended minimum sentence range determined under part 6 for the underlying offense as follows:
(a) If the offender is being sentenced for a second felony, 25%.
Before applying the increase, defendant’s upper minimum was 270 months. Two hundred seventy increased by twenty-five percent is approximately 337. Three hundred thirty-seven months is not life. I would conclude that if the Legislature had intended that a life sentence be an option, it would have so specified, either in the habitual-offender sentencing guidelines statutes or in a separate sentencing grid.
As such, I would decline to write the word “life” into the sentencing grid cell at issue; The Court of Appeals arbitrarily used three hundred months as a harbinger that a life sentence was available. But it is not at all clear that three hundred months is the dispositive guiding factor because cell III-A, in which 270 months is the upper minimum, allows for a life sentence. A more rational explanation is that the Legislature included a life option where it believed that the combined OV and PRY scores merited it. For instance, when a defendant *417 amasses one hundred or more points in OVs, a life sentence is an option, even where the upper minimum is less than three hundred months. In that cell, III-A, the range is 162 to 270 months or life. And in cell I-C, where the OV total is relatively low, zero to forty-nine points, and the PRV level is zero to twenty-four points, the sentence range is the same as that in the III-A cell, except that life is not an option. Thus, it appears that the availability of a life sentence is tied to the OV and PRV score totals, rather than the number of months represented by the upper minimum.
Here, neither defendant’s OV nor PRV score changed by virtue of increasing his upper limit pursuant to the habitual-offender sentencing guidelines statute. Therefore, because a life sentence is not an option for defendants having the OV and PRV scores reflected by cell II-B, absent an articulated upward departure, a life sentence is not available even if the upper minimum is increased to reflect a defendant’s habitual-offender status.
Thus, I would hold that in instances where a victim dies and homicide is an element of the sentencing offense, the proper score for OV 3 is zero points. Further, I would hold that if a defendant’s upper minimum is increased pursuant to the habitual-offender sentencing guidelines statute, whether a life sentence is available depends on whether it is denoted in the legislative sentencing grids and not on the number of months in a defendant’s upper minimum sentence. As such, I would reverse the decision of the Court of Appeals and remand this case to the trial court for the appropriate resentencing.
Weaver and Kelly, JJ., concurred with Cavanagh, J.

 A cursory search through our statutes shows that the Legislature is fully capable of using the term “injury or death” when it so means. Such a search reveals 156 instances in which the Legislature used some variation of the phrase “injury or death.” Even more compelling is the Legislature’s use of some variation of the phrase “injury or injury resulting in death” in several statutes. See, e.g., MCL 38.67a(3), 38.1390(1), 418.141, and 418.375(3). From this it is clear that when the Legislature intends to encompass either an injury or a death, or a death resulting from an injury, it is perfectly capable of stating what it means.

 Similarly, under MCL 777.33(l)(e), five points are scored when “[blodily injury not requiring medical treatment occurred to a victim.” But MCL 777.33(2)(d) instructs, “Do not score 5 points if bodily injury is an element of the sentencing offense.”

 It appears in this case that the victim did die instantly.

 The majority states that where a victim does not die instantly, I would hold that the victim still did not suffer a “life threatening or permanent incapacitating injury. ” That is not entirely accurate. I would hold that, for the purposes of scoring OV 3, which assesses points for the severity of injury suffered, the victim suffered the most severe injury possible: death. I believe that it is obvious that the graduated scale of points corresponds to a graduated scale of types of injury. I do not believe that the Legislature designed OV 3 so that a prosecutor could make an end-run around the exemption the Legislature included that prevents scoring one hundred points when a victim dies and death is an element of the sentencing crime. In the context of the clear language and purpose of the statute, I conclude that the Legislature did not see the need to state the obvious, which is that when a victim dies, points are not scored for the types of nonfatal injuries enumerated in the statute. See ante at 407 n 16, 409-410.